UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                   )
**UNITED STATES OF AMERICA**    )
                                                   )
           **v.**                    )        **Crim. No. 1:15-mj-139 RWR/GMH**
                                                 )
**HANAN AL SHARAF**               )
_____)

## REPORT AND RECOMMENDATION

This matter has been referred to the undersigned for a Report and Recommendation on defendant's motion to dismiss the government's complaint.[1] For the reasons stated below, the undersigned recommends that defendant's motion be granted.

## BACKGROUND

Defendant Hanan Al-Sharaf is a citizen of Kuwait who formerly served as a diplomatic agent at the Embassy of Kuwait in the United States. Shelley Aff. ¶ 4. From approximately August 10, 2011 through December 9, 2014, she served as the Finance Attaché at the Kuwait Embassy Health Office ("Health Office") in Washington, D.C. Id.

The Health Office is an official Kuwait government office maintained by the Kuwait Ministry of Health. Id. ¶ 5. The function of the Health Office is to coordinate medical treatment for Kuwaiti citizens who wish to come to the United States for treatment. Id. ¶ 6. The Health Office pays for health care expenses incurred by Kuwaiti nationals receiving medical treatment in the United States. Id. The Health Office processes payment to treatment providers and also provides an allowance to Kuwaiti citizens traveling to the United States for such treatment to

---

[1] The relevant docket entries for purposes of this Report and Recommendation are as follows: (1) Criminal Complaint against Hanan Al-Sharaf ("Compl.") [Dkt. 1]; (2) Affidavit of Special Agent Brendan M. Shelley in Support of the Criminal Complaint ("Shelley Aff.") [Dkt. 1-1]; (3) Defendant's Motion to Dismiss the Criminal Complaint ("Mot.") [Dkt. 34]; (4) Government's Memorandum in Opposition to Defendant's Motion to Dismiss ("Opp.") [Dkt. 38]; (5) Defendant's Reply in Support of Defendant's Motion to Dismiss ("Reply") [Dkt. 45].

cover their travel and lodging expenses. Id. The Health Office was overseen by both a senior official and defendant. Id. ¶ 7. As noted above, defendant served in this capacity from approximately August 10, 2011 until December 9, 2014. Opp., Exhibit A at 1.

On March 5, 2015, defendant was charged by criminal complaint with conspiring to commit several federal fraud and embezzlement offenses. See Compl.[2] The government alleges that, during her tenure as Finance Attaché, from approximately February 2014 to October 2014, defendant conspired with others to embezzle up to two million dollars from the Health Office. Shelley Aff. ¶¶ 9–11. The government alleges that, in furtherance of the conspiracy, defendant: (1) agreed to establish shell companies in the United States using names that resembled legitimate U.S. healthcare providers so they would go undetected; (2) directed others to prepare invoices from the shell companies for services that were not provided; (3) directed others to issue checks from the Health Office's U.S. bank account to the shell companies; (4) instructed others to provide her with cash payments from the stolen funds; (5) directed others to conceal her involvement in the embezzlement by changing payment information in the Health Office accounting system; and (6) instructed others to redeposit a portion of the stolen funds into the Health Office account in order to conceal the theft. Id.

Defendant was arrested on these charges on March 5, 2015. Defendant filed a motion to dismiss the criminal complaint against her on July 1, 2015, arguing that her residual diplomatic immunity precludes the criminal charge. See Mot. Chief Judge Roberts referred this motion to

---

[2] Specifically, the complaint charges defendant with violating 18 U.S.C. § 1956(h) by conspiring to commit violations of 18 U.S.C. §§ 1956(a)(1)(b)(i)-1957 by knowingly conducting financial transactions with funds derived from a scheme or artifice to obtain money or property owned by or under the custody and control of a financial institution by means of false and fraudulent pretenses in violation of 18 U.S.C. § 1344(2) and devising and intending to devise a scheme or artifice to defraud, and to obtain money and property by means of false or fraudulent pretenses, by means of interstate wire communications in violation of 18 U.S.C. § 1343. See Compl.

2

the undersigned for a Report and Recommendation on August 19, 2015.  The motion is ripe and ready for disposition.

## LEGAL STANDARD

The Vienna Convention on Diplomatic Relations ("VCDR") is an international treaty that sets forth, inter alia, the immunities to be accorded diplomatic agents.  See Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95, 1972 WL 122692.  The VCDR states that "every person entitled to privileges and immunities [under the VCDR] shall enjoy them from the moment he enters the territory of the receiving State on proceeding to take up his post."  Id. art. 39(1).  Those immunities include immunity from "any form of arrest or detention."  Id. art. 30(1).  The treaty further provides that

> [w]hen the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in the case of armed conflict. However with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist.

Id. art. 39(2).  There are thus two kinds of diplomatic immunity:  (1) full immunity afforded to persons actively serving as diplomatic agents, and (2) residual diplomatic immunity afforded to persons who are no longer active diplomatic agents.  As the Second Circuit has explained, "[a]lthough current diplomatic envoys enjoy absolute immunity from civil and criminal process, former diplomatic envoys retain immunity only 'with respect to acts performed by such a person in the exercise of his functions' as a diplomatic envoy."  Brzak v. United Nations, 597 F.3d 107, 113 (2d Cir. 2010) (quoting VCDR art. 39(2)) (internal citations omitted).  Thus, after diplomatic functions cease, a former diplomat "no longer enjoys the blanket, functional immunities" of the VCDR but instead is immune only with respect to conduct which was undertaken within the scope of his diplomatic duties.  Knab v. Republic of Georgia, No. 97CV3118, 1998 WL

3

34067108, at *4 (D.D.C. May 29, 1998). Residual immunity exists even after the defendant's diplomatic function has ended because "[t]he acts of a diplomatic agent in the exercise of his official functions are in law the acts of the sending State. It has therefore always been the case that the diplomat cannot at any time be sued in respect of such acts since this would be indirectly to implead the sending State." Baoanan v. Baja, 627 F. Supp. 2d 155, 162 (S.D.N.Y 2009) (citing Eileen Denza, Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations 439 (3d ed. 2008)).

The protections of the VCDR are codified at 22 U.S.C. § 254d, which provides that

> [a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations . . . or under any other laws extending diplomatic privileges and immunities, shall be dismissed. Such immunity may be established upon motion or suggestion by or on behalf of the individual, or as otherwise permitted by law or applicable rules of procedure.

22 U.S.C. § 254d. This Section "makes pellucid that American courts must dismiss a suit against anyone who is entitled to immunity under either the VCDR or other laws 'extending diplomatic privileges and immunities.'" Brzak, 597 F.3d at 113. "Properly invoked immunity shields a defendant 'not only from the consequences of litigation's results, but also from the burden of defending themselves.'" De Luca v. United Nations Org., 841 F. Supp. 531, 533 (S.D.N.Y. 1994). Diplomatic immunity applies equally to both civil and criminal actions. Brzak, 597 F.3d at 113. The individual claiming immunity from prosecution bears the burden of showing that he is entitled to immunity. See Burns v. Reed, 500 U.S. 478, 486 (1991) (stating that where a defendant claims prosecutorial immunity from suit, he "bears the burden of showing that such immunity is justified for the function in question").

In evaluating a motion to dismiss a criminal charge pursuant to Section 254d, the court must determine whether the acts charged in the criminal complaint constitute acts that would be

4

immune from prosecution. See United States v. Khobragade, 15 F. Supp. 3d 383, 388 (S.D.N.Y. 2014). In so doing, the court must consider the allegations in the complaint "without judging whether the underlying conduct actually occurred." Brzak, 597 F.3d at 113. Further, the court must not consider whether the "defendan[t] acted in bad faith or with improper motive" in "determin[ing] whether or not [he is] immune from the present action," but instead must conduct a purely functional analysis to determine whether immunity applies. DeLuca, 841 F. Supp. at 535.

## ANALYSIS

In her motion, defendant argues that she enjoys residual diplomatic immunity[3] for the conduct alleged in the government's complaint. Mot. at 7. In defendant's view, the acts complained of by the government were undertaken "in the exercise of [her] functions as a member of the mission" within the meaning of Article 39(2) of the VCDR. Id. at 8. Defendant claims that because her duties as Finance Attaché involved reviewing and approving payments to U.S. medical providers, any fraudulent payments to "shell" medical providers were precisely within the scope of her ordinary job duties. Id. at 9–10. In other words, her conduct was inextricably intertwined with her performance of her diplomatic job duties. Reply at 6. Defendant asserts that immunity is clear when her conduct which forms the basis of the complaint is examined objectively, without reference to whether the conduct was in fact fraudulent. Mot. at 10.

The government responds with two arguments. First, the government contends that defendant is not permitted to assert any immunity in this case; instead, the State of Kuwait must

---

[3] Defendant does not claim that she enjoys full diplomatic immunity under VCDR Article 39(1). Instead, because defendant left her diplomatic post in December 2014, she may only claim residual diplomatic immunity under VCDR Article 39(2). Opp. at 5–7; Brzak, 597 F.3d at 113.

5

do so on her behalf. Opp. at 7–8. Put differently, defendant, as an employee of Kuwait, cannot exercise Kuwait's sovereign prerogative to assert immunity. Id. at 8. According to the government, Kuwait has made no indication that it desires immunity for defendant, and thus she cannot assert this defense. Id. Second, the government argues that residual immunity should not extend to defendant in this case because her fraudulent acts did not fall within the scope of her functions as a Kuwaiti diplomat. Id. at 10. The government contends that creating shell companies to perpetrate fraud, depositing checks into shell companies' bank accounts, and distributing those funds to co-conspirators are not related to defendant's functions as Finance Attaché. Id. at 11. Instead, they were merely private acts, carried out for personal profit, which provided no benefit to Kuwait. Id. As the government reasons, Kuwait would never have authorized defendant to defraud it. Id. at 15.

As demonstrated below, defendant's residual diplomatic immunity mandates the dismissal of the complaint. First, there is no indication in any treaty or case law that the State of Kuwait must authorize defendant to assert her residual diplomatic immunity as a defense in this action. Second, defendant has established that she enjoys residual diplomatic immunity with respect to the conduct at issue in the government's complaint. The acts complained of by the government were undertaken within the scope of defendant's ordinary diplomatic duties attendant on her position as Finance Attaché. As such, she is immune from prosecution for that conduct.

### A. Defendant May Assert Residual Diplomatic Immunity Without Kuwait's Affirmative Authorization.

The government's first argument borders on the frivolous. The government directs this Court to no case or other authority which actually holds that a state must assert immunity on behalf of its diplomats in order for a diplomat, or former diplomat, to receive the benefit of

diplomatic immunity. Instead, the government relies on two related assertions. First, immunity is intended for the benefit of the sovereign, not individual officials. Id. at 7 (citing Breard v. Greene, 523 U.S. 371, 378 (1998)). Second, a nation may waive the immunity of its officials. Id. at 8 n.2 (citing VCDR art. 32(1)). From these premises, the government concludes that because the State of Kuwait has not affirmatively authorized defendant to assert residual diplomatic immunity, she may not raise that defense here.

The government is incorrect. First, Section 254d itself permits a defendant to raise immunity on her own behalf: "[s]uch immunity may be established upon motion or suggestion by or on behalf of the individual, or as otherwise permitted by law or applicable rules of procedure." 22 U.S.C. § 254d (emphasis added). Under this statute, there is no requirement that the individual's sovereign first sanction the assertion of immunity. Second, the Court is unconvinced that the government's conclusion flows from its premises. The fact that a nation may waive its officials' immunity does not make the converse true – namely, that it must expressly assert it on behalf of its officials before those officials can receive the benefit of immunity. Instead, under the VCDR, diplomatic immunity attaches automatically. See VCDR art. 39(1) ("Every person entitled to privileges and immunities shall enjoy them from the moment he enters the territory of the receiving State on proceeding to take up his post.") (emphasis added); id. art. 39(2) ("with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist" after the diplomat's post terminates). Moreover, for residual diplomatic immunity, such protection is not time-limited but "persists" indefinitely. See id. art. 39(2). Indeed, even in cases of waiver of immunity by the sovereign, the VCDR requires such waiver to be express. Id. art. 32(2)

("Waiver [of a diplomat's immunity] must always be express."). Accordingly, Kuwait's silence on defendant's immunity does not prevent her from asserting it here.

      **B.    Defendant is Entitled to Residual Diplomatic Immunity Because the Charged Conduct Fell Within the Scope of Her Diplomatic Duties.**

Having established that defendant may raise residual diplomatic immunity on her own behalf, the next question is whether the conduct at issue in the government's complaint falls within the scope of defendant's diplomatic duties. As noted above, "[w]hen a court attempts to determine whether a defendant is seeking immunity 'with respect to acts performed by such a person in the exercise of his functions,' the court must do so without judging whether the underlying conduct actually occurred, or whether it was wrongful." Brzak, 597 F.3d at 113. Similarly, a defendant's "bad faith or . . . improper motive . . . has no bearing" on the question of immunity. De Luca, 841 F. Supp. at 535. The court must instead assess whether the acts in question relate to the functions of the individual in her diplomatic post. See Tuck v. Pan Am. Health Org., 668 F.2d 547, 550 (D.C. Cir. 1981) (concluding that diplomat was immune for acts undertaken as director of international health organization). As the Second Circuit has explained, protected activities include those which are "inextricably tied to a diplomat's professional activities." Swarna v. Al-Awadi, 622 F.3d 123, 135 (2d Cir. 2010). Conversely, residual diplomatic immunity does not extend to "actions that [are] entirely peripheral to the diplomatic agent's official duties." Swarna v. Al-Awadi, 607 F. Supp. 2d 509, 518 (S.D.N.Y. 2009), aff'd in part, rev'd in part on other grounds Swarna, 622 F.3d 123.

In Brzak, for example, the district court found that the defendant diplomats enjoyed residual diplomatic immunity. Brzak v. United Nations, 551 F. Supp. 2d 313, 320 (S.D.N.Y. 2008), aff'd Brzak, 597 F.3d 107. There, employees of the United Nations sued several former U.N. officials for employment discrimination and retaliation. Id. at 315–16. One of the

8

plaintiffs further alleged that one of the officials had sexually harassed her. Id. The defendants raised their residual diplomatic immunity under the VCDR and Section 254d. Id. at 319. The district court concluded that the defendants enjoyed immunity with respect to the employment claims because the officials were charged with resolving internal employment disputes as part of their job duties. Id. at 319. Moreover, the district court came to the same conclusion even as to the sexual harassment claim, finding that such conduct represented "abuse of authority in the workplace. Whether [defendant's] alleged acts were intended or perceived as sexual in nature may be relevant to their wrongfulness, but not to the determination of functional immunity." Id. at 320.

By contrast, the Second Circuit in Swarna found that the defendant did not enjoy residual immunity. Swarna, 622 F.3d at 128. There, the defendant, a former Kuwaiti diplomat, employed the plaintiff as a domestic servant. Id. The plaintiff sued the defendant, making numerous claims of inhumane treatment, physical and psychological abuse, and rape. Id. at 130. The defendant attempted to raise residual diplomatic immunity. Id. at 137–38. The Second Circuit rejected this defense, finding that residual immunity "does not apply to actions that pertain to [the official's] household or personal life and that may provide, at best, 'an indirect' rather than a 'direct . . . benefit to' diplomatic functions." Id. at 134–35 (quoting Park v. Shin, 313 F.3d 1138, 1142 (9th Cir. 2002)). The Court of Appeals reasoned that employing a personal, household servant had nothing to do with the diplomat's official duties. Id. at 138; see also Baoanan, 627 F. Supp. 2d at 165–68 (finding that employment of a domestic worker was not within the scope of a diplomat's official functions under VCDR Article 39(2) because the worker's "duties were performed for the sole benefit of fulfilling the [diplomat's] family's personal household needs, and are unrelated to [the diplomat's] diplomatic functions as

9

a member of the mission"). Furthermore, the plaintiff was not an employee of the Kuwaiti government, suggesting that the defendant did not exercise control over her by virtue of his governmental station. Swarna, 622 F.3d at 139.

 Here, the conduct alleged in the government's complaint falls squarely within defendant's official functions as Finance Attaché. Within the Kuwait diplomatic mission, defendant was charged with overseeing the operations of the Health Office at the Kuwait Embassy. This included reviewing claims for payment from medical providers, processing claims for payment, and personally approving such payments. In its complaint, the government alleges that defendant ordered payments to shell healthcare companies and altered entries in the Health Office accounting system to hide her fraud. See Shelley Aff. ¶¶ 9–11. Because in assessing her claim of immunity this Court must view defendant's charged conduct objectively, without reference to its alleged wrongfulness, the Court finds that the conduct at issue in the government's complaint is precisely within the scope of defendant's ordinary diplomatic functions at the Kuwait mission. At best, the government alleges that defendant engaged in fraud while performing those duties. This is insufficient to overcome defendant's immunity afforded to her under Section 254d and the VCDR. Like the diplomats in Brzak, who were immune as to claims related to their oversight of employment disputes, here defendant must be protected from prosecution for claims relating to her discharge of ordinary oversight duties as Finance Attaché.

 The government's counterarguments are unavailing. First, it claims that defendant's involvement in the creation and maintenance of shell companies and accepting stolen funds were not acts that formed a part of her diplomatic duties. Opp. at 11. Yet this conduct, even if it occurred, is still protected because it was "inextricably tied" to defendant's diplomatic

10

duties.  Swarna, 622 F.3d at 135.  Unlike the diplomat in Swarna, who employed a household servant, here defendant worked in the Kuwait Embassy as an official member of the Kuwait mission.  Baoanan, 627 F. Supp. 2d at 169 ("Physical location" of the diplomat's work "should be considered in determining whether an act is official or private").  She oversaw other diplomatic agents in the Health Office.  Her conduct was directly related to the functions of the Health Office and had nothing to do with her individual or household needs.  See id. (no immunity should be provided for actions that "pertain predominantly to the private needs" of the diplomat).  Indeed, it is hard to imagine how defendant's actions were "entirely peripheral" to her duties.  Swarna, 607 F. Supp. 2d at 518.  Instead, the conduct at issue here, albeit allegedly fraudulent, easily falls within defendant's diplomatic functions within the Health Office.[4]  Residual diplomatic immunity was designed to protect precisely this kind of conduct.

       The government's argument on this point also seeks to evade the Court's standard of review.  The Court will not consider whether the transactions alleged were fraudulent.  Instead, the Court views the alleged conduct objectively.  In Orfila, the D.C. Circuit found the defendant diplomat immune, under a similar statute, from the plaintiff's action for the defendant's breach of contract and intentional infliction of emotional distress related to the termination of the plaintiff's employment, notwithstanding the plaintiff's claim that the official had acted in bad

---

[4] The government cites Baoanan for the proposition that defendant's conduct must fall within a recognized list of the functions of a diplomatic mission in order to be entitled to immunity.  Opp. at 12; Baoanan, 627 F. Supp. 2d at 163 (citing VCDR art. 3(1)).  That list, drawn from VCDR Article 3, is informative on the question presented but is in no way authoritative.  As the court in Baoanan noted, the VCDR does not define what acts fall within the protection of Article 39(2).  Baoanan, 627 F. Supp. 2d at 163.  Instead, the district court in Baoanan merely chose to look to Article 3 for guidance.  Id.  Further, the court observed that other acts not contained in that list might satisfy the Article 39(2) standard, including "acts taken 'in the regular course of implementing an official program or policy of the mission.'"  Id. (quoting Swarna, 607 F. Supp. 2d at 517).  Ignoring whether defendant committed fraud, an objective examination of the conduct alleged in the complaint demonstrates that defendant's actions were undertaken as part of implementing the functions of the Kuwait Health Office.  Her conduct thus falls well within the scope of protected conduct under the VCDR.

faith. Donald v. Orfila, 788 F.2d 36, 37 (D.C. Cir. 1986). The Court of Appeals refused to characterize the plaintiff's termination from employment as an "individual" rather than "official" act based on the asserted impropriety of the defendant's motive. Id. The D.C. Circuit reasoned that if it were to deny the defendant immunity in such a manner, the immunity shield, "which Congress intended to afford solid protection, would indeed be evanescent." Id. Likewise, the government's position here, if accepted, would mean that every criminal act is an "individual" act which is not a part of the perpetrator's diplomatic functions (and therefore not protected by immunity). If such were true, immunity would be unavailable in every criminal case. In short, there would be no residue in a diplomat's residual immunity.[5] See also Osman v. Annan, No. 07-00837-CV-W-NKL, 2008 WL 2477535, at *2 (W.D. Mo. June 16, 2008) ("routine allegations of wrongful conduct or improper motive" should not be permitted to defeat diplomatic immunity, or else "the protection Congress intended for international organizations and their officials would be thwarted").

Second, the mere fact that the alleged conduct harmed Kuwait's interests is insufficient to overcome defendant's immunity. Opp. at 13. A foreign nation would be hard-pressed to justify how the criminal conduct of one of its diplomats aided that nation. Under the government's logic, almost no criminal conduct would be immunized because criminal conduct arguably never serves the interests of the diplomat's sovereign. Because it would effectively gut diplomatic

---

[5] The government also points to United States v. Guinand, 688 F. Supp. 774 (D.D.C. 1988), but this Court finds the case unhelpful. There, a diplomatic agent was charged with cocaine distribution. Id. at 774. The alleged misconduct occurred while the defendant was employed as a diplomat. Id. at 776. The district court, however, did not engage the doctrine of residual diplomatic immunity. See id. Instead, it appears that the court assumed, without analysis, that the defendant's cocaine distribution fell outside his official duties. The primary basis of the court's decision not to dismiss the complaint was the failure of the defendant to leave the United States within a reasonable time after his diplomatic duties ceased. Id. at 776–77. While this Court might be inclined to agree with the Guinand court's unspoken assumption regarding cocaine distribution, the decision in Guinand provides no rationale that this Court can apply here.

immunity in criminal cases, such a finding is not required for defendant's conduct to fall within the scope of her diplomatic duties. Similarly, the government's contention that defendant did not perform acts "on behalf of or [which] were imputable to the sending State" is inapposite. Opp. at 14. Again, the losses of the Kuwaiti government are not relevant to the narrow inquiry this Court must make. All the Court is empowered to do is assess whether defendant's conduct, viewed objectively, occurred within the scope of her diplomatic functions. The undersigned recommends that the Court find that it did.

## CONCLUSION

For the foregoing reasons, this Court recommends that defendant's motion to dismiss be granted.

The parties are hereby advised that failure to file timely objections to the findings and recommendations set forth in this report may waive your right of appeal from an order of the District Court adopting such findings and recommendations. See Thomas v. Arn, 474 U.S. 140 (1985).

Date:  September 14, 2015

                                                                         G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE